Next case, 412-0896-WC, Livingston County Sheriff's Dept. v. Workers' Compensation Comm'n May it please the court, counsel. My name is Terry Short and I represent the Livingston County Sheriff's Dept. in this case. I would be extremely brief because our argument is relatively simple. I would start by saying that unfortunately on reviewing the file before the arguments this morning and last night, I am forced to concede that on the standard of review, counsel is correct. It would be a manifest way to the evidence at this level. Because the facts are in dispute in our opinion with regard to the petitioner's thoughts or what she was thinking, what happened. Basically what this case boils down to from the respondent's point of view is a two-pronged question. The first is clearly a rising out of argument on whether or not the petitioner's fall on the stairs as alleged arose out of her employment. I would submit to the court that the evidence that was presented at trial and is in the record, the only thing that supports the finding on the part of the arbitrator is that the petitioner testified that she was in a hurry or testified that she was worried about the road officer being mad at her or that she was trying to get to the female inmate that she was supposed to pat down for admission into the jail. The arbitrator in his decision first talks about the stairway that the petitioner tripped on being industrial in nature, but there is absolutely nothing in the record that defines what the difference is between an industrial stairway and the stairway right down the hall in this building. Virtually every multi-story structure in this country has a stairway in it. Let's set that aside for a second. I think we can all agree it's well established that merely walking down a flight of stairs at work doesn't expose the worker to a risk greater than that of the public, correct? That's correct. And that's how we start out. Yes. So that would be a losing proposition for the claimant. What about the fact that if the job responsibility is to carry awkward objects or is in a hurry for some reason to get down the stairs in this particular occasion because of the demands or the requests of a supervisor? Can that not support an award? I would say that under the case law and the seized case that is cited in the decision, that it would seem to indicate that that would be the case. In this case, however, even though there was testimony that the petitioner wore a belt that she was required to wear by her employer, she was apparently carrying a scanner and she was wearing shoes that the arbitrator once again characterized as heavier than street shoes. I don't know how you make that determination other than the fact that virtually every boot I've ever worn is heavier than my street shoe. But the petitioner was specifically asked at trial whether any of those issues had any bearing or any positive factor on her fault. And she specifically testified that there was nothing about any of those issues that had any contribution. Okay. She has to live with that testimony. What about the issue, though? Wasn't there something in the record about receiving several calls? Was there some kind of a hurried reason that she was under the gun to get down there quicker on this occasion because of the need to get down there with this detainee? Isn't that in the record? That was her testimony, Your Honor. But she also testified that the whole gist of that issue revolves around her requirement to make a wellness check every 30 minutes, I believe the record says, within this mail pod that she was assigned to. The respondent's witness, Ms. Matching, Lynn Cahill Matching, testified that some of the officers had trouble making that time constraint. The petitioner testified that she didn't have any trouble making that time constraint. Also, both the petitioner and Ms. Matching testified that the petitioner was aware of the fact that the wellness checks took precedence and that making it over to the other area of the jail in order to do the pat down on the female inmate was not a time constraint requirement. That was to be done as time permits after she finished her wellness checks. She testified as well that she was aware that that was the case. Nonetheless... She didn't testify to claimant, never testified she was motivated to hurry down the stairs in order to maintain her normal duties in the male detention facility? She didn't testify to that? She testified that she was in a hurry. And she testified that she had been called two or three times by the road officer in the detention center where she was going to pat down the female inmate. But she also testified that she was aware that that was not a time sensitive issue, getting over to pat down the female inmate. Is that relevant? I think it's relevant in that if you look at the totality of the circumstances in this case, I think that's relevant for a couple reasons. Number one, there is no mention... I mean, the accident was January 25, 2010. The 19B hearing was held on March 16, 2011. So that's 13 months after the accident. And nowhere between the day she fell in the facility and the 19B hearing did she ever mention that she was in a hurry, did she ever mention that she was distracted, or did she ever mention that she was under the gun. That's credibility. I'm sorry? That's credibility. I would agree with that, Your Honor. That's the commission's job, not ours. I would agree. Except in this case, virtually every other piece of evidence with regard to the accident doesn't support her version of events. But if she was actually rushing down the stairs, isn't that compensable if she falls because of it? Because of a job constraint? Well, no, not because of a job constraint. It was going to pat down the female inmate within the duties that she was expected to perform. The fact that she rushed downstairs when she didn't have to rush downstairs, does that make it non-compensable? I think it does. I don't think so. I mean, there's cases where people do exactly what they're told not to do by their employers, yet they're still carrying out their employers' duties, and their compensations are warranted. I mean, the fact that she may have been rushing downstairs when she didn't have to rush downstairs, I don't think necessarily takes her out of compensability. If rushing down the stairs to perform work is what caused her injury. Well, I would agree. But once again, and I will also have to agree that that's a decision on the weight of the evidence, but the veracity of the witness, and that's a finding of fact for the commission to make. But I still think that the totality of the circumstances surrounding the accident indicate that all she did was for whatever reason, known only to her, missed a step and fell. I don't think there's anything other than the statements that she made at trial. I don't think there's anything else in the record that supports her being in a hurry or supports her being distracted other than her testimony at trial. Wouldn't her testimony be sufficient? The testimony, I think the case law, and I believe we cited it in the brief, although I can't come up with the case off the top of my head, but I believe the case law says that when the evidence doesn't preponderate otherwise, that benefits can be awarded on the basis of the petitioner's testimony alone. I mean, the commission believes her. She says she was operating in a hurried manner because of the circumstances of the job at the time. And the commission believes her. What's wrong with that? Well, you answered it. You said the other evidence has to preponderate, right? I think so, Your Honor. And you're saying the other evidence does preponderate beyond her testimony? I believe so. So we're back to manifest way. We have to decide if an opposite conclusion is fairly apparent, right? Yes. All right. And the other issue is whether or not the need for the surgery that was done and the medical treatment was related to this particular injury. The examining doctor, Dr. Lanny, Mr. Moran, they both, in their records and in their testimony, they talk about observing the petitioner when she wasn't aware that she was being watched, when she wasn't being actually actively examined, and she seemed to move unrestricted, unfettered. I believe it was Mr. Moran talked about how she was very restricted in her movements until the examination was over and then she was able to get up and off the table and move around completely unrestricted when she wasn't aware that she was being watched. The diagnostic studies that were done, there were EMG studies done by Dr. Atwater, and those came out normal. The MRIs that were done, there were MRIs done prior to the accident from a previous injury and MRIs done after the accident, and there was no change between those two MRIs. So I would submit that if surgery was necessary, based on the fact that there's no positive diagnostics until a discogram is eventually done, there were no positive diagnostics, and if she did need surgery, she probably needed surgery prior to this accident. And I don't think that the need for surgery was related to this particular fall. Thank you, counsel. Counsel, you may respond. Thank you. Good morning. May it please the court and may it please the counsel. I'm Jean Swee. I represent Ms. Boring in this case. My client, Ms. Boring, had worked five years at the Livingston County Correctional Center or County Jail. I think our best testimony came in from probably the respondent's witness, Lynn Cahill-Mashing. She was the jail administrator. What she said at trial on behalf of the employer was that the job that my client was performing on 12510 when she hurt herself was mail pot. It was called mail pot. And what she said is that it's challenging and it's fast-paced. What she said also was my client was one of the best in the county at performing it, and she said if they're planning correctly, they can complete these wellness checks every 30 minutes. She also said that most of the officers could not do the job within the 30 minutes. And when you look physically at what it required, it required that the officer go up and down two flights of 16 steps every half an hour. They had to go to seven different mail pot units and count up to 64 detainees every half hour. Physically, then, they would have to if the detainees made a request. They want toothpaste. They want a razor. They want some personal comfort item. The officer would have to keep that in mind, go down and get it, in addition to making the count and return it to the... So do you sort of have like two subparts or alternative theories? Are you saying that because of the general nature of her responsibilities, if she falls, she'd be entitled to recover? Or were you arguing that because of the particular heightened circumstances and need on this occasion? So what is it that you're saying? Well, I was just trying to explain why she was in a hurry. She had a lot to do in that half an hour. Well, what you're trying to do, it's bolstering her testimony factually, contextually bolstering her testimony that she was in a hurry. Exactly. I don't think it's just my client's testimony she was in a hurry. I think it's also Lynn Cahill Mashing's testimony that she was in a hurry. Not only on that specific moment when she fell. The specific moment when she fell. Because of the specific job, duties, or issues. That job. But in addition to the fact, and I think that might have been enough just in and of itself, and I'd certainly argue that it would be because it was a lot to keep track of. She was keeping track of what am I going to return? Oh, I've got to hurry up and keep my duties. But in addition to that, then she's getting this call from this road officer who's saying, hey, get down here. You're the only woman working today. You've got to get down here and pat this female detainee. So what Ms. Cahill Mashing says is, the road officer's located at a facility five to seven minutes away. So my client not only has to keep up with her 30-minute rotation, she has to go over and pat down this detainee five to seven minutes away. So she has to complete what is already a difficult duty and add another 15 minutes' work on it, I would assume at least. So she had to complete 45 minutes in 30 minutes' time. And I'm also arguing that the road officer was creating an additional stress on my client. What she said is, I know the statute says that the male pod unit takes precedence over patting down a road, you know, patting down a new detainee, but the truth is the road officer's getting what my client said was in the past, they will throw a fit if they wait too long. So she's thinking about the additional stress of trying to comply with meeting that so the road officer can get back to work again. And the road officer called three times? Yeah, two to three times is what she said. So she was kind of feeling a little stressed out about it. I mean, we all know what that stress feels like. And what my client says was she thinks she missed the step. She's hurrying down the steps to get over, to go over and pat down the detainee. She is preoccupied with the tasks she needs to complete for the male pod. She said this during her testimony. She's preoccupied with the tasks she needs to complete for the male pod wellness check. She's stressed because she knows the road officer is becoming impatient. She's hurrying to complete this work in the allotted time that she's got. She missed the last step. And what she said was, I missed the last step, I landed hard, and I twisted my back. So, you know, pretty pronounced injury. I also argued in the arbitrator look at it that the steps are indefinite looking. They are not open to the public. This is a jail facility. They're not open to the public. It's hard steel. The pictures of it, I thought... Well, now you're getting into... But anyway... Yeah. I mean, I think it's because she was hurrying. Hurrying and stress. In addition to the hurrying issue, there's also the issue of the frequency that she used the steps. I think it's certainly an arguable thing. I think it's arguable. Sixteen steps twice every half an hour. According to the briefs, it's 16 times or more per day that she would be using these steps. Every half an hour, two sets of steps, 16 steps per set. So I guess a total of 16 times a day she would go two flights of 16 steps. So basically what you're saying is that you would argue that the nature of a job requires her to traverse the stairs more than the general public in any event. You combine this on this occasion with the heightened need to get down there, and you combine that with the fact there's some evidence in the record to support the commission's decision. Yeah, I think there's some evidence to support the commission's decision. Is that a summary? Yes, I would say so. So I'll move on to causal connection if you don't mind. Tom Moran is the PA. He's not a doctor. He's the PA over at OSF. And counsel was referring to Tom as being the guy who's talking about my client's credibility. I want to point out that Tom is the respondent's doctor, but he never released my client to return to work after her accident. He always placed her on restrictions, and the respondent could not provide work within those restrictions. He also made a diagnosis of lumbosacral strain, which he said was work-related. That's Volume 2, page 220. He referred my client to an orthopedic surgeon on 2810 because she had tingling into her legs. That's Volume 2, 230 and 231. He kept my client on sedentary work after LAMI's report came in, their section 12. LAMI's report came in on 1011-10. On 11-410 and on 2811, Mr. Moran kept my client on restrictions. So obviously he thought something was wrong. She wasn't on restrictions before she fell. Dr. LAMI, I think it's an interesting thing, too. I think he actually supports causation. Because what LAMI said was she fell. I think she had a diagnosis of back strain. He said, I don't think she needs a fusion, but hey, you know what, maybe we ought to do a discogram and find out. Well, Dr. Carmichael, who was one of the treating doctors, he's a physiatrist in Bloomington, he looked at LAMI's report and he says, you know what, maybe a discogram is a pretty good idea. So he did one. He even said, based on the IME report, I did a discogram. And he did it on 1210-10. Did it from L3 through S1. What he found is it reproduced severe pain at L4-5 and L5-1. Thought that a fusion was recommended. He said he talked to Dr. Atwater about it, and they both decided a fusion was appropriate. Dr. Carmichael said he thought it was related to the work accident, as did Dr. Atwater. Basically, you have Atwater and Carmichael. You show pining that the claimant's condition of well-being was related to the accident. LAMI's on the other side, and the commission chose the two doctors, Atwater and Carmichael, over LAMI. Right. Thank you. Counsel, reply? Just briefly, Your Honors. I would say that Ms. Mashing, counsel talks about Ms. Mashing opining that the petitioner was in a hurry. I don't know how Ms. Mashing could know whether or not the petitioner was in a hurry, other than her knowledge of what the actual job is. I would not argue that the time constraints of her job would pressure her to try to get it done. In this case, I just think that the petitioner doesn't show, from an evidence perspective, anything other than her own opinion some 13 months after the act that she was in a hurry or that she was distracted or that something had caused her fall, other than her just not paying attention to what she was doing. As far as the medical and the causal connection, like I said earlier, the two diagnostic studies, I think, the MRI that was done prior to the accident and the MRI that was done after the accident, both show the exact same findings, that all of the diagnoses were degenerative back issues. And while I would agree that all the opinions were that she suffered a back strain or an aggravation of a preexisting condition during this January 25th accident, I don't think that that accident was severe enough, and I don't think that all of the medical records support an eventual two-level fusion based on that January accident. Can I ask a question? Yes, sir. On your third issue, when you talk about the circuit court's decision confirming the commission finding that her current condition of ill-being is related to the work accident, is it against the manifest way of the evidence? I notice you don't cite a single case in support of the argument. Isn't that waiver under 342? There's not a single case cited in support of that argument. I don't know the answer to that, Your Honor. Thank you, Counsel Ball, for your argument. This matter will be taken under advisement when this position is held issue. We will stand and recess for a short while.